**United States District Court**
For the Northern District of California

**NOT FOR PUBLICATION**

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

LEVI STRAUSS & CO, et al.,

    Plaintiffs,

    v.

PAPIKIAN ENTERPRISES, INC, et al.,

    Defendants.

No. C 10-05051 JSW

**ORDER GRANTING IN PART AND DENYING IN PART DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

## INTRODUCTION

Now before the Court for consideration is the Motion for Summary Judgment filed by Defendants, Papikian Enterprises, Inc. and Galoust Papikian (collectively "Papikian"). The Court has considered the parties' papers, relevant legal authority, and the record in this case. For the reasons set forth herein, the Court HEREBY GRANTS IN PART AND DENIES IN PART the motion.

## BACKGROUND[1]

Plaintiff, Levi Strauss & Co. ("LS&Co."), owns numerous incontestable trademarks for its clothing line, including "LEVI'S®," "501®" and others. (Compl. ¶¶ 16-23.) On May 26, 2000, Papikian registered the domain name "501usa.com." (Docket No. 21, Declaration of Galoust Papikian ("Papikian Decl."), ¶ 10.) Through his website, Papikian offers for sale discontinued or out-of-stock styles of LS&Co. brand jeans. (*Id.*, ¶ 11.) The record also shows that Papikian uses meta tags such as "501" and "Levis jean" to direct traffic to the website. (Docket No. 32-8, Declaration of Timothy Cahn ("Cahn Decl."), ¶ 21, Ex. R.)

---

[1] The facts are undisputed by the parties, unless otherwise noted.

According to Papikian, he developed this business model after he saw "USA501.com," a website that offered used LS&Co. products for sale. (Papikian Decl., ¶ 10.) Papikian also claims that LS&Co. previously referred its customers to 501USA.com, when they were looking for out-of-stock items. (*Id.*, ¶ 11.) LS&Co. claims that, except for sales through its retail stores and websites, it sells products in the United States and abroad directly to authorized retailers only and that it does not sell through distributors, wholesalers or jobbers. LS&Co. also claims that its retailers are not permitted to re-sell first quality merchandise. (Docket No. 32-30, Declaration of Thomas Onda ("Onda Decl."), ¶ 9, Ex. F.) LS&Co. also attests that its retailers are required to abide by a number of other policies relating to their use of LS&Co. trademarks. (*Id.*, ¶ 10, Ex. G.)

According to LS&Co., it learned of Papikian's website, as well as Papikian's use of other domain names that incorporated LS&Co. marks, in or about May 2003. (Cahn Decl. ¶¶ 1-2; Onda Decl., ¶¶ 12-13.) In May 2003, LS&Co., through counsel Timothy R. Cahn ("Cahn"), sent Papikian a cease and desist letter, in which it demanded, *inter alia*, that Papikian cancel or transfer any domain names that appropriate LS&Co. marks, refrain from using LS&Co. marks in metatags, refrain from using LS&Co. marks on Papikian's websites, and refrain from selling LS&Co. branded goods to customers in European Union countries. (Cahn Decl., ¶ 3, Ex. B; Papikian Decl., ¶ 12.) The parties engaged in discussions relating to the cease and desist letter until approximately March, 2004. (*See, e.g.,* Cahn Decl., ¶¶ 5-6, 8-14, Exs. C, E-G, I; Papikian Decl., ¶¶ 12-14.)

There is some dispute about what transpired during those discussions. Papikian claims that, in the Fall of 2003, he told Cahn that he would make changes to the 501USA.com website, which Cahn had suggested. Papikian also claims that he told Cahn that he would no longer use the domain names and websites associated with "550jeans.com," "517jeans.com," and "cheapjeans.com." According to Papikian, he did not hear from Cahn or LS&Co., until LS&Co. filed the complaint in this action on November 8, 2010. (Papikian Decl., ¶ 14.)

LS&Co. claims that after it wrote the cease and desist letter, Papikian called Cahn and stated that he only had about 1000 units of LS&Co. products on hand and that he would

1  immediately cease sales in Europe, because he had very few sales left there. (Cahn Decl., ¶ 5,
2  Ex. C.) LS&Co. claims that it was left with the impression that Papikian planned to abandon
3  the business and that he only needed time to sell off remaining inventory. (*Id.*) LS&Co. also
4  claims that, three months later, Papikian requested additional time to dispose of his inventory
5  and also offered to direct web traffic from some of his websites to LS&Co.. LS&Co. declined
6  this offer. (*Id.*, ¶¶ 6, 8, Ex. E.)

7  Thereafter, LS&Co. claims that, until approximately March 2004, it corresponded and
8  spoke with Papikian and various lawyers about Papikian's activities, and it claims that Papikian
9  did make some of the promised changes to his website. (*Id.*, ¶¶ 9-14, Exs. F-J.) However,
10 LS&Co. claims that it "recently" viewed the 501USA.com website and discovered that the
11 website had changed radically, in that it looked more professional, offered LS&Co. products
12 exclusively, and made more extensive use of LS&Co. trademarks. (Onda Decl., ¶ 14; Cahn
13 Decl., ¶¶ 15-16, Exs. K-P.) In addition, LS&Co. claims that Papikian is using the website
14 "501USA.net," which is similar to the "501USA.com" website.

15 On November 8, 2010, LS&Co. filed the Complaint in this action, in which it asserts
16 claims for relief under federal and state law for trademark infringement, trademark dilution,
17 unfair competition, and cybersquatting. LS&Co. also asserts a claim for trademark
18 infringement under European law, and it seeks an accounting.

19 **ANALYSIS**
20 **A.    Evidentiary Issues.**

21 Papikian filed his motion before the parties began to engage in discovery, and before
22 Papikian submitted to a deposition regarding the facts set forth in his declaration. LS&Co.
23 objects to the Papikian declaration on the basis that it is unexamined hearsay. (Docket No. 33,
24 Plaintiff's Objection to Papikian Declaration and Rule 56(d) Objection ("Rule 56(d)
25 Objection").) This objection is overruled. Papikian's declaration is not material to the
26 resolution of LS&Co.'s claims for violation of European Law. Further, even if the Court were
27 to accept the facts in Papikian's declaration as true as to LS&Co.'s remaining claims, the Court
28 finds the motion should be denied as to those claims.

3

1    LS&Co. also filed an objection pursuant to Federal Rule of Civil Procedure 56(d), which
2 provides that "[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, *it*
3 *cannot present facts essential to justify its opposition*, the court may: (1) defer considering the
4 motion or deny it; (2) allow time to obtain affidavits or declarations or to take discovery," or (3)
5 issue any other appropriate order." Fed. R. Civ. P. 56(d) (emphasis added). LS&Co. argues
6 that discovery would have been pertinent to a number of issues, including Papikian's laches
7 defense. (Rule 56(d) Objection at 2:12-3:4.) However, LS&Co. takes the position that the
8 Court can deny the motion on the existing record, and it asks that the Court defer a ruling only
9 if the Court concludes that summary judgment should be granted. (Rule 56(d) Objection at
10 3:11-12.) As set forth below, the Court finds that Papikian's motion should be denied as to all
11 claims, except the claim for violations of European trademark law. Although the Court grants
12 Papikian's motion with respect to that claim, in LS&Co. has not attested that it cannot present
13 facts essential to justify its opposition to Papikian's motion on that claim, let alone specified
14 what such facts would be. Accordingly, the Court overrules LS&Co.'s Rule 56(d) objection.

**B.     Legal Standards Applicable to Motions for Summary Judgment.**

16    Summary judgment is proper when a "movant shows that there is no genuine dispute as
17 to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P.
18 56(a). "A party asserting that a fact cannot be or is genuinely disputed must support the
19 assertion by" citing to, *inter alia*, depositions, documents, affidavits, or other materials. Fed. R.
20 Civ. P. 56(c)(1)(A). A party may also show that such materials "do not establish the absence or
21 presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to
22 support the fact." Fed. R. Civ. P. 56(c)(1)(B). An issue is "genuine" only if there is sufficient
23 evidence for a reasonable fact finder to find for the non-moving party. *Anderson v. Liberty
24 Lobby, Inc.*, 477 U.S. 242, 248-49 (1986). A fact is "material" if the fact may affect the
25 outcome of the case. *Id*. at 248. "In considering a motion for summary judgment, the court may
26 not weigh the evidence or make credibility determinations, and is required to draw all
27 inferences in a light most favorable to the non-moving party." *Freeman v. Arpaio*, 125 F.3d
28 732, 735 (9th Cir. 1997).

4

1    The party moving for summary judgment bears the initial burden of identifying those
2 portions of the pleadings, discovery, and affidavits which demonstrate the absence of a genuine
3 issue of material fact. *Celotex Corp. v. Cattrett*, 477 U.S. 317, 323-24 (1986). Where the
4 moving party will have the burden of proof on an issue at trial, it must affirmatively
5 demonstrate that no reasonable trier of fact could find other than for the moving party. *Id.*
6 Once the moving party meets this initial burden, the non-moving party must go beyond the
7 pleadings and by its own evidence set forth specific facts showing that there is a genuine issue
8 for trial. *See* Fed. R. Civ. P. 56(e). The non-moving party must "identify with reasonable
9 particularity the evidence that precludes summary judgment." *Keenan v. Allan*, 91 F.3d 1275,
10 1279 (9th Cir. 1996) (quoting *Richards v. Combined Ins. Co.*, 55 F.3d 247, 251 (7th Cir. 1995))
11 (stating that it is not a district court's task to "scour the record in search of a genuine issue of
12 triable fact"). If the non-moving party fails to make this showing, the moving party is entitled
13 to judgment as a matter of law. *Celotex*, 477 U.S. at 323.

14 **C.    Papikian's Motion is Granted in Part and Denied in Part**.

15    Papikian argues that he is entitled to summary judgment on all claims based on four
16 affirmative defenses: (1) statute of limitations; (2) laches; (3) the first sale doctrine; and (4)
17 nominative fair use. In the alternative, Papikian moves for summary judgment on the basis that
18 there is no triable issue of fact on LS&Co.'s trademark dilution or cybersquatting claims.
19 Finally, Papikian argues that the Court should not exercise supplemental jurisdiction over
20 LS&Co.'s claim for trademark infringement under European trademark law.

21    **1.    Statute of Limitations.**

22    Papikian's first argument in support of his motion is that all of LS&Co.'s claims, federal
23 and state, are barred by the statute of limitations.[2] LS&Co.'s federal claims all arise under the
24 Lanham Act, which does not provide for a specific limitations period. In such cases, courts
25 presume "'that Congress intended that the courts apply the most closely analogous statute of
26 limitations under state law.'" *Reed v. United Transp. Union*, 488 U.S. 319, 323 (1989) (quoting

---

[2]    Papikian and LS&Co. do not devote much briefing to this issue, and neither party has distinguished between the state law claims and the federal claims.

5

*DelCostello v. Teamsters*, 462 U.S. 151, 158 (1983)); *see also Jarrow Formulas, Inc. v. Nutrition Now*, 304 F.3d 829, 836 (9th Cir. 2002). Papikian argues that the most closely analogous statutes of limitations under California law are California Code of Civil Procedure 343 and California Business and Professions Code § 17208. Those statutes govern LS&Co.'s state law claims and provide for a four year statute of limitations from the time the cause of action accrued. *See Saul Zaentz Co. v. Wozniak Travel, Inc.*, 627 F. Supp. 2d 1096, 1114 (N.D. Cal. 2008) (citing Cal. Bus. & Prof. Code § 17208, Cal. Code Civ. P. § 343).

The Ninth Circuit has applied the three-year statute of limitations from California Civil Code § 338(d) to a trademark infringement claim brought under the Lanham Act. *Karl Storz Endoscopy Amer., Inc. v. Surgical Tech., Inc.*, 285 F.3d 848, 857 (9th Cir. 2002). However, as the Ninth Circuit subsequently has observed, the *Karl Storz* court "failed to consider whether Congress intended that laches, as opposed to the statute of limitations be the sole timeliness defense available to [Lanham Act] claims." *Jarrow Forumlas,* 304 F.3d at 836. Laches is an equitable defense, whereas statute of limitations is a creature of law. *Id*. at 835. "Statutes of limitations generally are limited to actions at law and therefore are inapplicable to equitable causes of action. ... Laches serves as the counterpart to the statute of limitations, barring untimely equitable causes of action." *Id*. (internal citation omitted).

While the *Jarrow Forumlas* court noted that "[t]he proper interplay between laches and the statute of limitations is somewhat elusive," it did not resolve whether a statute of limitations defense may be applied to a claim under the Lanham Act. *Id*. at 836-37. Whether or not a statute of limitations defense is a viable defense to LS&Co.'s Lanham Act claims, LS&Co. argues, and the record suggests, that Papikian's alleged violations are ongoing. (*See* Compl., ¶¶ 28-32[3], Ex. B; Cahn Decl., ¶¶ 15-16, Exs. K-P.) Thus, "the statute of limitations is conceivably only a bar to monetary relief for the period outside of the statute of limitations." *Jarrow Formulas*, 304 F.3d at 837 (citing, *inter alia*, 4 J. Thomas McCarthy, *McCarthy on Trademarks and Unfair Competition* § 31.33 (4th ed. 2001) ("Usually, infringement is a continuing wrong,

---

[3] LS&Co. is vague about the time involved and alleges that Papikian's conduct began "at some time in the past," and continues "until the present." (Compl. ¶¶ 28, 29.)

6

and the statute of limitations is no bar except as to damages beyond the statutory period.")). Therefore, even if the Court assumes a statute of limitations defense may bar some portion of LS&Co.'s claims, it still would be entitled to pursue damages based on activity that occurred within the statute of limitations period.

Accordingly, the Court denies, in part, Papikian's motion for summary judgment on this basis.

### 2. Laches.

Papikian also argues that LS&Co.'s claims are barred by the doctrine of laches. "'Laches is an equitable time limitation on a party's right to bring suit....'" *Jarrow Formulas*, 304 F.3d at 835 (quoting *Boone v. Mech. Specialties Co.*, 609 F.2d 956, 958 (9th Cir. 1979)). In order for Papikian to prevail on a laches defense, he must show that LS&Co. unreasonably delayed in filing suit and that he suffered prejudice as a result of that delay. *Id.*; *see also Saul Zaentz*, 627 F. Supp. 2d at 1108. The Court does not reach the question of whether LS&Co. unreasonably delayed in bringing suit, because, on the record currently before the Court, it cannot conclude that Papikian has met his burden to show the requisite prejudice.

The Ninth Circuit has recognized "two chief forms of prejudice in the laches context, evidentiary and expectations-based." *Danjaq LLC v. Sony Corp.*, 263 F.3d 942, 955 (9th Cir. 2001). Papikian does not base his motion on "evidentiary" prejudice. Rather, he focuses on "expectations-based" prejudice. (*See* Papikian Decl., ¶ 25.) "Expectations-based prejudice derives from a defendant '[taking] actions or [suffering] consequences that it would not have, had the plaintiff brought suit promptly.'" *Saul Zaentz*, 627 F. Supp. 2d at 1117 (quoting *Danjaq LLC*, 263 F.3d at 955). For example, a defendant may establish the requisite expectations-based prejudice "by showing that during the delay, it invested money to expand its business or entered into business transactions based on his presumed rights." *Id.* (citing *Miller v. Glenn Miller Productions, Inc.*, 454 F.3d 975, 999 (9th Cir. 2006)); *see also Grupo Gigante SA de CV v. Dallo & Co, Inc.*, 391 F.3d 1088, 1105 (9th Cir. 2004) (defendant may establish prejudice "by proving that it has continued to build a valuable business *around its trademark* during the time that the plaintiff delayed the exercise of its legal rights") (emphasis added).

7

1 According to Papikian, "[t]he 501usa.com website barely supports my wife and three 2 children. Issuing an injunction against the use of the domain name or against selling Levi 3 products would be devastating to me and my family since I have no other source of income and 4 no assets other than inventory in stock." (Papikian Decl., ¶ 25.) In his reply brief, Papikian 5 argues that he "invested a significant amount of money to expand the business and upgrade the 6 website." (Reply Br. at 8:9-10.) Papikian offers no evidence to support that argument other 7 than a reference to the screenshots of the website that LS&Co. submitted with its opposition.[4] 8 Those screenshots may support a finding that Papikian upgraded his website. However, they do 9 not demonstrate that he has expanded his business as a result of the upgrade, and they do not 10 demonstrate the amount of money involved to complete the alleged upgrades.

11 Moreover, Papikian's declaration does no more than suggest that any prejudice he 12 suffered was based on the alleged infringing uses of LS&Co.'s marks. That also is insufficient 13 to establish prejudice. *See Internet Specialties, Inc. v. Milon-DiGiorgio Enters, Inc.*, 559 F.3d 14 985, 981 (9th Cir. 2009) ("If ... prejudice could consist merely of expenditures in promoting the 15 infringed name, then relief would have to be denied in practically every case of delay.") 16 Papikian bears the burden of establishing the defense of laches and, thus, to prevail on this 17 motion he must demonstrate that no reasonable trier of fact could find other than for him. 18 *Celotex*, 477 U.S. at 323. Although Papikian may be able to establish the requisite prejudice at 19 trial, on the existing record he has failed to meet this burden.

20 Accordingly, the Court denies, in part, Papikian's motion for summary judgment on this 21 basis as well.

22 **3.     First Sale Doctrine.**

23 Papikian also moves for summary judgment on the basis that his conduct is protected 24 under the "first sale doctrine." This doctrine provides that "with certain well-defined 25 exceptions, the right of a producer to control distribution of its trademarked product does not

---

[4] After briefing on the motion was complete, Papikian submitted additional evidence, including evidence that purported to show the amount of money invested in upgrading and maintaining the website. However, because Papikian failed to demonstrate good cause for submitting this evidence after he filed the motion and before briefing was complete, the Court declined to consider it. (*See* Docket No. 45.)

8

1  extend beyond the first sale of the product." *Sebastian Int'l Inc v. Longs Drugs Stores Corp.*,
2  53 F.3d 1073, 1074 (9th Cir. 1995). Thus, "[r]esale by the first purchaser of the original article
3  under the producer's trademark is neither trademark infringement nor unfair competition." *Id.*

4  In the *Sebastian* case, the plaintiff wanted to sell its hair care products only through
5  professional salons. To assist in this goal, it sold its products through members of an
6  organization it controlled (the "Collective"). The defendant, which was not a member of the
7  Collective, purchased and sold plaintiff's products in its stores. Although the plaintiff argued
8  that defendant's actions violated the Lanham Act, the Ninth Circuit concluded that defendant's
9  conduct was protected under the First Sale doctrine, because the defendant did nothing more
10 than "stock, display and resell" Sebastian's product under the Sebastian trademarks. *Id.* at
11 1076-77. The Ninth Circuit noted, however, that "conduct by the reseller other than merely
12 stocking and reselling genuine trademark products may be sufficient to support a cause of
13 action for infringement." *Id.* at 1076. By way of example, the Ninth Circuit noted that the First
14 Sale doctrine might not apply if a defendant were using the mark to suggest an affiliation with
15 the trademark holder. *Id.*

16 Although LS&Co. has not responded directly to this argument in its opposition brief, it
17 has alleged that Papikian has done more than merely stock, display and resell genuine LS&Co.
18 goods on its website. (Compl. ¶¶ 28, 30-31.) In addition, LS&Co. has put forth evidence from
19 which a reasonable juror could conclude that Papikian's website and his use of the LS&Co.'s
20 marks suggests he is an authorized LS&Co. retailer or is otherwise affiliated with LS&Co.,
21 which could negate Papikian's first sale defense. (*See, e.g.* Cahn Decl., ¶¶ 15-17, 21, Exs. M-P,
22 R.) Papikian bears the burden of establishing the facts to support this defense, and, thus to
23 prevail on this motion, he must establish that no reasonable trier of fact could find other than in
24 his favor. *Celotex*, 477 U.S. at 323. Although Papikian may be able to establish the defense at
25 trial, on the existing record he has failed to meet this burden.

26 Accordingly, the Court denies, in part, Papikian's motion on this basis as well.
27 //
28 //

9

**4.     Nominative Fair Use.**

Papikian moves for summary judgment on his "nominative fair use" defense. "In cases where a nominative fair use defense is raised, [courts] ask whether (1) the product was 'readily identifiable' without use of the mark; (2) defendant used more of the mark than necessary; or (3) defendant falsely suggested he was sponsored or endorsed by the trademark holder." *Toyota Motor Sales, Inc. v. Tabari*, 610 F.3d 1171, 1175-76 (9th Cir. 2010) (citing *Playboy Enterprises, Inc. v. Welles,* 279 F.3d 796, 801 (9th Cir. 2002), in turn quoting *New Kids on the Block v. News Am. Publ'g, Inc.*, 971 F.2d 302, 308-09 (9th Cir. 1992)). "This test 'evaluates the likelihood of confusion in nominative use cases'" and is

> designed to address the risk that nominative use of the mark will inspire a mistaken belief on the part of consumers that the speaker is sponsored or endorsed by the trademark holder. The third factor speaks directly to the risk of such confusion, and the others do so indirectly: Consumers may reasonably infer sponsorship or endorsement if a company uses an unnecessary trademark or 'more' of a mark than necessary.

*Id.* If a defendant can establish that its use of the plaintiff's mark satisfies all three *New Kids* factors, the use will not infringe plaintiff's mark. *Id*. However, if a defendant cannot satisfy all of the *New Kids* factors, a court may require a defendant to modify his use of the mark. *Id.*

In order to conduct this analysis, a court looks to the "'reasonably prudent consumer' in the marketplace." *Id.* (citing *Dreamwerks Prod. Grp., Inc. v. SKG Studio,* 142 F.3d 1127, 1129 (9th Cir.1998)). In this case, as in the *Toyota Motor Sales* case, the relevant marketplace would be the online marketplace, "and the relevant consumer is a reasonably prudent consumer accustomed to shopping online[.] ... Unreasonable, imprudent and inexperienced web-shoppers are not relevant." *Id.* Finally, "[a] defendant seeking to assert nominative fair use as a defense need only show that it used the mark to refer to the trademarked good[.] ... The burden then reverts to the plaintiff to show a likelihood of confusion." *Id.* at 1182.

In the *Toyota Motor Sales* case, the defendants were autobrokers, who offered their services through the websites "buy-a-lexus.com" and "buyorleaselexus.com," which had also included copyrighted photographs of the plaintiff's Lexus brand vehicles and one of plaintiff's design marks. *Id.* at 1175-76. It was undisputed that when a person purchased a Lexus through

10

1  the defendants, they received a genuine Lexus vehicle sold by an authorized Lexus dealer.
2  However, following a bench trial, the district court ordered the defendants to stop using their
3  domain names, and it enjoined them from using the Lexus mark in any other domain name. *Id.*
4  at 1176. The Ninth Circuit reversed.

5  With respect to the first factor, it stated that "the Tabaris need to let consumers know
6  that they are brokers of Lexus cars, and that's nearly impossible to do without mentioning
7  Lexus." *Id.* at 1181. As to the second and third factors, the court noted that the defendants' use
8  of the "stylized Lexus mark and 'Lexus L' logo was more use of the mark than necessary and
9  suggested sponsorship or endorsement by Toyota," because the defendants "could adequately
10 communicate their message without using the visual trappings of the Lexus brand." *Id.* at 1181.
11 The court also stated that "those visual cues might lead some consumers to believe they were
12 dealing with an authorized Toyota affiliate. Imagery, logos and other visual markers may be
13 particularly significant in cyberspace, where anyone can convincingly recreate the look and feel
14 of a ... brand at minimal expense." *Id.*

15 However, because the defendants had changed the look and feel of their website at the
16 time of trial, which included "prominent" disclaimers, in large font, the court concluded that
17 "[r]easonable consumers would arrive at the [defendants'] site agnostic as to what they would
18 find. Once there, they would immediately see the disclaimer and would promptly be disabused
19 of any notion that the ... website is sponsored by" plaintiff. *Id.* at 1182. "Because there was no
20 risk of confusion as to sponsorship or endorsement," the defendants' use of the plaintiff's Lexus
21 mark was fair." *Id.*

22 In this case, LS&Co. argues that there are disputed issues on the second and third *New*
23 *Kids* factors. LS&Co. does not present any evidence of actual confusion, *i.e.* that any
24 consumers who have visited Papikian's website believe that he is an authorized LS&Co. online
25 retailer or that he is affiliated with LS&Co. In addition, there is evidence in the record to show
26 that, at some point, Papikian did put disclaimers on the website, which stated he was not
27 affiliated with LS&Co. (*Compare* Cahn Decl., Ex. A with *id.*, Exs. H, P.) However, LS&Co.
28 submits screen shots of Papikian's websites, which incorporate numerous LS&Co. marks, and

11

which demonstrate that the disclaimer may not always be obvious or prominently displayed. (Cahn Decl., Exs. H, K, N-P.) These screen shots also demonstrate that there are genuine issues of material fact as to whether Papikian uses more of LS&Co. marks than is necessary.

In addition, the domain name 501USA.com is the type of domain name that the Ninth Circuit has stated could suggest sponsorship or endorsement by the trademark holder. *Toyota Motor Sales*, 610 F.3d at 1179 ("Sites like trademark-usa.com, trademark-of-glendale.com or e-trademark.com will also generally suggest sponsorship or endorsement by the trademark holder; ... a location modifier following a trademark indicates that consumers can expect to find th brand's local subsidiary, franchise, or affiliate.") LS&Co. has therefore put forth evidence to show that there are genuine issues of material fact in dispute with respect to Papikian's fair use defense.

Accordingly, the Court denies Papikian's motion, in part, on this basis as well.

**5. Dilution.**

Pursuant to the Federal Trademark Dilution Act, the "use of a mark or trade name in commerce that is likely to cause dilution by blurring or dilution by tarnishment of the famous mark, regardless of the presence or absence of actual or likely confusion, of competition, or of actual economic injury," is prohibited. 15 U.S.C. § 1125(c)(1), (5). However, the nominative fair use of a mark will not constitute dilution by blurring or tarnishment. *Id.* § 1125(c)(3)(A).

**a. Blurring.**

Dilution by blurring occurs when an "association arising from the similarity between a mark or tradename and a famous mark ... impairs the distinctiveness of the famous mark." 15 U.S.C. § 1125(c)(2)(B). In order to make this determination, the Court may consider the following, non-exclusive, factors: (1) the degree of similarity between the mark or trade name and the famous mark; (2) the degree of inherent or acquired distinctiveness of the famous mark; (3) the extent to which the owner of the famous mark is engaging in substantially exclusive use of the mark; (4) the degree of recognition of the famous mark; (5) whether the user of the mark or trade name intended to create an association with the famous mark; and (6) any actual association between the mark or trade name and the famous mark. *Id.* § 1125(c)(2)(B) (I)-(vi).

12

Papikian fails to address any of these factors. Rather, he argues that his use of LS&Co. marks cannot dilute by blurring, because he only uses those marks to identify LS&Co.'s own goods. Papikian cites no legal authority to support this proposition, and as discussed above, the Court finds there are genuine issues of material fact in dispute as to whether Papikian used more of LS&Co.'s marks than is necessary. In addition, it is not clear that Papikian's use of the 501® mark in the domain names refers only to LS&Co.'s products, rather than his own retail services. Although LS&Co. will bear the burden of proof on this claim at trial, in order to prevail on this motion, Papikian was required to demonstrate the absence of a genuine issue of material fact. The Court finds that Papikian's conclusory argument fails to satisfy this burden.

### b. Tarnishment.

Dilution by tarnishment occurs when "association arising from the similarity between a mark or a trademark and a famous mark ... harms the reputation of the famous mark." 15 U.S.C. § 1125(c)(2). Papikian's entire argument in support of his motion is as follows, in cases involving domain names, courts often find that tarnishment may occur when a defendant's use of plaintiff's mark is associated with an "unwholesome" website. *See, e.g., Deere v. & Co. v. MTD Prods., Inc.*, 41 F.3d 39, 43 (2d Cir. 1999) ("'Tarnishment'" generally arises when the plaintiff's trademark is linked to products of shoddy quality, or is portrayed in an unwholesome or unsavory context likely to evoke unflattering thoughts about the owner's product.") (citing, inter alia, *Academy of Motion Picture Arts and Sciences v. Creative House Promotions, Inc.*, 944 F.2d 1446, 1457 (9th Cir. 1991) (evaluating dilution under Cal. Bus. & Prof. Code § 14330)). Papikian then concludes that "[s]ince there is no genuine dispute regarding the absence of any facts tending to show a likelihood of dilution by tarnishment, defendants are entitled to judgment as a matter of law on this claim." (Mot. at 14:15-17.) As with his argument on dilution by blurring, the Court concludes this conclusory argument is insufficient to satisfy his burden as the moving party.

Accordingly, for these reasons, the Court denies, in part, Papikian's motion for summary judgment on the dilution claim.

13

### 6. Anti-Cybersquatting Consumer Protection Act ("ACPA").

In order to establish a violation of the ACPA, LS&Co. must prove that: (1) it has a valid trademark that is entitled to protection; (2) its mark is distinctive or famous; (3) Papikian's domain name is identical or confusingly similar to, or in the case of famous marks, dilutive of, LS&Co.'s mark; (4) that Papikian used, registered, or trafficked in the domain name; and (5) that he did so with a bad faith intent to profit from the mark. *See Bosley Med. Inst., Inc. v. Kremer*, 403 F.3d 672, 681 (9th Cir. 2005); 15 U.S.C. § 1125(d)(1)(A). If the Court finds that Papikian believed, or had reasonable grounds to believe, that his use of the LS&Co. marks was fair use or otherwise lawful, it cannot conclude he acted with bad faith intent. *See* 15 U.S.C. § 1125(d)(1)(B)(ii).

Papikian argues that he is entitled to summary judgment on this claim because: (1) the 501® mark is neither famous nor distinctive; and (2) he did not have a bad faith intent to profit from the use of the domain name. Papikian contends that LS&Co. cannot establish that the 501® mark is famous or distinctive, because it was not registered until August 22, 1989. In response, LS&Co. attests that it has used the 501® mark since 1898. (Onda Decl., ¶ 4.) LS&Co. also submits evidence of advertising and public recognition of the 501® mark, and attests that it "has spent an enormous amount of money advertising the 501® mark" and "has sold several million pairs per year for many years." (*Id.*, ¶¶ 5-6, 8, Exs. D-E.) Therefore, the Court finds that there are genuine issues of material fact in dispute on this element of LS&Co.'s ACPA claim.

In addition, the Court also concludes that LS&Co. has established that there are material facts in dispute with regard to Papikian's intent. The ACPA provides a list of nine non-exclusive factors for courts to use to determine whether a defendant acted with bad faith intent. 15 U.S.C. § 1125(d)(1)(B)(i)(I)-(IX). Among those factors are, "the person's bona fide noncommercial or fair use of the mark in a site accessible under the domain name." *Id.* § 1125(d)(1)(IV). As set forth above, the Court concludes that there are disputed issues of fact in relation to Papikian's fair use defense. Another factor is "the person's registration or acquisition of multiple domain names which the person knows are identical or confusingly

14

similar to marks of others that are distinctive at the time of registration of such domain names, or dilutive of famous marks of others that are famous at the time of registration of such domain names, without regard to the goods or services of the parties." *Id.*  LS&Co. submits evidence of a decision adverse to Papikian, issued by the WIPO, relating to his use of the domain name "CalvinKlein-sale.com."  Finally, a further factor to consider in evaluating a defendant's intent is "the extent to which the mark incorporated in the person's domain name registration is or is not distinctive and famous within the meaning of subsection (c) of this section." *Id.* § 1125(d)(1)(IX).  As noted above, the Court concludes that LS&Co. has put forth evidence relating to the issue of whether the 501® mark is distinctive or famous.

Accordingly, the Court concludes that Papikian has failed to meet his burden to show he is entitled to summary judgment on the ACPA claim, and it denies, in part, his motion on that basis.

### 7. European Law.

In its eighth claim for relief, LS&Co. asserts that Papikian has purchased goods bearing LS&Co. marks outside the European Union and has sold them directly to persons within countries within the European Union or to third parties within the European Union without LS&Co.'s consent.  LS&Co. argues that these actions violate Articles 5 and 7 of the First Council Directive 89/104/EEC of 21 December 1988, to approximate the laws of the Member States relating to trademarks, as amended by the Agreement on the European Union of 2 May 1992 ("Trademark Directive").  As the party seeking to invoke this Court's jurisdiction, LS&Co. bears the burden on this issue. *See, e.g., Association of American Medical Colleges v. United States*, 217 F.3d 770, 778-79 (9th Cir. 2000) (citations omitted).

Papikian first argues that the Court cannot exercise jurisdiction over this claim, because European trademark laws have no extraterritorial effect.  However, LS&Co. is not attempting to apply European law to Papikian's activities within the United States.  Rather, as is evident from the allegations in its complaint and from its opposition, LS&Co. only seeks to apply European law to Papikian's activities within the European Union. (Compl. ¶¶ 66-76; Opp. Br. at 16-17.) The Court, therefore, finds Papikian's first argument to be without merit.

15

Papikian's second argument is that the Court should decline to exercise supplemental jurisdiction over this claim. District courts may exercise supplemental jurisdiction over claims "that are so related to claims in the action within such original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution." 28 U.S.C. § 1367(a). However, a district court may decline to exercise supplemental jurisdiction when, "in exceptional circumstances, there are other compelling reasons for declining jurisdiction." 28 U.S.C. § 1367(c)(4). In order to make that determination, a district court may consider such factors as the values of judicial economy, convenience, fairness, and comity. *See City of Chicago v. Int'l College of Surgeons*, 522 U.S. 156, 173 (1997) (citations omitted).

The Ninth Circuit has not addressed this issue. In support of this argument, Papikian relies on *Voda v. Cordis Corp.*, 476 F.3d 887 (Fed Cir. 2007), in which the Federal Circuit found that "considerations of comity, judicial economy, convenience, fairness, and other exceptional circumstances constituted compelling reasons to decline jurisdiction" over claims involving foreign patents. *Voda*, 476 F.3d at 898. Papikian also relies on *Levi Strauss & Co. v. Americanjeans.com*, 10-CV-5340-JF, 2011 WL 1361574 (N.D. Cal. Apr. 11, 2011) (hereinafter "*Americanjeans.com*"), in which Judge Fogel, applying *Voda*, granted a motion to dismiss a claim for violations of European Trademark, on facts similar to the instant case. *See id.*, 2011 WL 1361574, at *2-3.

Neither *Voda* nor *Americanjeans.com* are binding on this Court. However, as Judge Fogel noted, the question presented in *Voda* is "analogous" to the instant dispute, and, based on the facts of this case, the Court finds the reasoning of *Voda* as well as *Americanjeans.com* to be persuasive. In *Voda*, the court found that exercising supplemental jurisdiction over foreign patent infringement claims could undermine the obligations of the United States under international treaties such as the Paris Convention for the Protection of Industrial Property ("Paris Convention") and the Agreement on Trade-Related Aspects of Intellectual Property Rights ("TRIPS"), which uphold the independence of each country's system for adjudicating patent rights. *See id.* at 899-900. The Federal Circuit concluded that this fact constituted an "exceptional circumstance to decline jurisdiction" under Section 1367(c)(4).

16

In reaching this conclusion, the Court emphasized that the exercise of supplemental jurisdiction over such claims would require "defin[ing] the legal boundaries of a property right granted by another sovereign and then determin[ing] whether there has been a trespass to that right," which would contravene of the language of these treaties. *Id*. at 900. The disputes in this case implicate trademark rights under the same treaties at issue in *Voda*. Resolution of LS&Co.'s eighth claim for relief would require to the Court to consider the scope of the rights granted by the European Union, and, to determine if Papikian has violated those rights. As noted by Judge Fogel, these treaties provide for the independence of those countries who have issued European marks to LS&Co. to adjudicate LS&Co.'s rights under those marks. *See Americanjeans.com*, 2011 WL 1361574, at *3 (citing Paris Convention, art. 2, April 26, 1970, 21 U.S.T. 1583; Agreement on Trade-Related Aspects of International Property Rights art. 41, Apr. 15, 1994, 1867 U.N.T.S. 154, 33 I.L.M. 1144).

With respect to considerations of comity and relations between sovereigns, the court in *Voda* held that the exercise of supplemental jurisdiction over foreign patent infringement claims could prejudice the rights of foreign governments and undermine the "spirit of cooperation" that forms the basis of the comity doctrine. *Id.*, 476 F.3d at 901-02. The court noted that because patent rights are territorial, "it would be incongruent to allow the sovereign power of one [government] to be infringed or limited by another sovereign's extension of its jurisdiction." *Id*. Consequently, the "adjudication of ... foreign patent infringement claims should be left to the sovereigns that created the property rights in the first instance." *Id.* at 902. Similarly, "trademark rights exist in each country solely according to that country's statutory scheme." *Grupo Gigante*, 391 F.3d at 1093 (internal quotations and citations omitted).[5]

LS&Co. does not suggest that this Court has a duty to adjudicate its foreign law claims, that foreign courts would inadequately protect its trademark rights, or that foreign courts are willing to have United States courts exercise jurisdiction over their trademarks. *Cf. Voda*, 476

---

[5] Although the *Grupo Gigante* case involved claims under the Paris Convention, the court was not called upon to address the issue whether it should decline to exercise jurisdiction under Section 1367. In addition, the plaintiffs challenged conduct that was occurring within the United States. Thus, this Court does not find the opinion inconsistent with the decision it reaches today.

17

F.3d at 887 (finding that absence of such facts in comity analysis weighed against exercising supplemental jurisdiction). Furthermore, LS&Co. has not convinced this Court that exercising supplemental jurisdiction over this claim would not prejudice the rights of European governments. *Cf. Americanjeans.com*, 2011 WL 1361574, at *3; *Voda*, 476 F.3d at 901.

The *Voda* court also found that due to the court's lack of institutional competence in the foreign patent regimes at issue and the absence of any requirement of foreign countries to recognize or obligate the enforcement of United States courts' judgments regarding foreign patents, substantial judicial resources may be expended in vain if the court were to adjudicate the foreign patent infringement dispute. *Id*. at 903. Here, both parties submitted extensive foreign authority in support of their arguments on this claim. The Court finds that the concerns outlined by the *Voda* court regarding judicial competence, and the possibility of jury confusion, could prolong these proceedings and increase the costs involved for all parties. Thus, the interests of judicial economy also weigh against exercising supplemental jurisdiction over this claim.

Although the Court's opinion should not be construed to mean that it would decline to exercise supplemental jurisdiction over every case involving foreign trademarks, the Court finds based on the record in this case, there are compelling reasons to decline to exercise supplemental jurisdiction over LS&Co's eighth claim for relief.

Accordingly, for the foregoing reasons, the Court grants, in part, Papikian's motion for summary judgment, and it dismisses LS&Co's eight claim for relief without prejudice to LS&Co. pursuing that claim in the appropriate foreign tribunal.

## CONCLUSION

For the foregoing reasons, Papikian's motion for summary judgment is GRANTED IN PART AND DENIED IN PART.

**IT IS SO ORDERED.**

Dated: August 24, 2011

JEFFREY S. WHITE
UNITED STATES DISTRICT JUDGE